## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CIVIL ACTION NO. _____

|  |  |
|---|---|
| SLAM DUNK, LLC, on behalf of itself and all others similarly situated, | **CLASS ACTION COMPLAINT** |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| CONNECTICUT GENERAL LIFE INSURANCE COMPANY, | |
| Defendant. | |

Plaintiff Slam Dunk LLC ("Plaintiff"), and on behalf of itself and all others similarly situated, for its Complaint against defendant Connecticut General Life Insurance Company ("Defendant"), states as follows:

### NATURE OF THE ACTION

1.      This is a class action brought on behalf of plaintiff and similarly situated owners of group universal life ("GUL") insurance policies issued and administered by Defendant.  The claims of the Plaintiff and the proposed class are based on the language of their GUL policies, the terms of which are substantially similar for all GUL policies and not subject to individual negotiation.  Plaintiff seeks to represent policy owners who have been forced to pay unlawful and excessive cost of insurance charges (*i.e.*, Monthly Cost of Insurance Rates ("COI")) by Defendant for GUL coverage.

2.      The Plaintiff, along with numerous other GUL policy owners, was, and continues to be, forced to pay inflated COI charges that are not allowed by the plain language of their GUL

policies.  The subject policies issued by Defendant specify that monthly COI rates "will be based on" expectations of future mortality experience — and nothing else.  Defendant also contractually promised to review those mortality-only based COI rates at least once a year.

3.     These policy provisions created a mutual and reciprocal commitment between Defendant and all putative class members such that owners of GUL policies agreed to let Defendant increase COI rates if expectations of future mortality experience get worse, and in return, Defendant agreed to *decrease* COI rates on its customers when there was an improvement in future mortality experience.  Defendant, however, has failed to live up to its end of the bargain.

4.     Mortality rates have *declined* significantly over the past several decades. Defendant's expectations of future mortality experience have therefore substantially changed in its favor.  As a result, insureds are living longer than Defendant originally anticipated when the policies at issue were first priced.  That is one reason that Defendant's parent company, Cigna, reporting on behalf of Defendant, has repeatedly stated in annual reports and/or regulatory filings over the past 20 years that mortality experiences were better than it expected.  Despite this improved future mortality experience, Defendant has not lowered the COI rates it charges for its GUL policies.

5.     The component of what a COI rate can be "based on" is the most important feature of GUL policies.  The COI charge is typically the highest expense that a GUL policy owner pays.

6.     Universal Life insurance policies and variable life policies combine death benefits with a savings or investment component—this savings/investment component is known often as the policy's "Cash Value." The Cash Value consists of money held in trust by Defendant for

Plaintiff and the Class, and represents amounts contributed by the owner of the policy to his or her account in excess of the COI, plus any interest accrued on the Cash Value balance. Defendant deducts the COI charge monthly from the policy owner's Cash Value, so the policy owner forfeits the COI charge entirely to Defendant. The COI charge represents Defendant's risk — the chance that Defendant will have to pay the death benefit (the policy's "coverage amount") to the policy's beneficiary when the insured dies. The payment of COI charges to cover Defendant's risk is the policy's insurance component, and Defendant contractually agreed to base its COI rate only on future mortality experience. Defendant calculates the COI charge by multiplying the applicable COI by the net amount at risk.

7.      The subject policies here each state that the COI rates Defendant charges "will be based on our expectations of future mortality experience." The insurance industry has referred to this provision as a single consideration policy form because the only factor that the carrier can and must consider when reviewing COI rates is expectations of future mortality experience. This provision requires Defendant to *decrease* COI rates if it experiences an improvement in expected mortality. In other words, if Defendant expects fewer people to die at a given rate than originally anticipated, then it will expect to pay out fewer death benefits at a given rate. If Defendant pays out fewer death benefits over time, then Defendants cost of providing life insurance goes down, and the COI rate should correspondingly decrease. If the situation had been reversed, so that future mortality experience had been worse for Defendant than originally anticipated, then Defendant would have been contractually entitled to increase its COI rates.

8.      In the face of the substantially improved future mortality experience that has benefited Defendant, Defendant has wrongly concluded that its policies grant it the right to increase COI rates if its mortality experience was worse than anticipated, but they do not require

it to decrease COI rates in the face of years and years of improved mortality experience—an improvement that has, in fact, already occurred.  This construction by Defendant is a continuing breach of the terms of the GUL policies.

9.     The overcharges by Defendant reduce a GUL policy's Cash Value:  money that would otherwise be the policy owner's and growing by payment of guaranteed interest is taken improperly by Defendant for its own benefit and use.  As the Cash Value is reduced, the policy owner has less funds to use to pay future COI charges, invest, borrow and ultimately withdraw as cash.  As a result of this misconduct, Plaintiff seeks monetary relief for the COI overcharges that Defendant has wrongly imposed on its customers that purchased GUL policies.

## THE PARTIES

10.     Plaintiff Slam Dunk, LLC ("Slam Dunk") is a limited liability company organized and existing under the laws of Florida, with a principal place of business in Oklahoma City, Oklahoma.  There is a single member of the Slam Dunk and that member is an Oklahoma resident.  Plaintiff is the owner of twenty-two (22) Defendant GUL insurance policies, insuring the lives of various individuals, with various face values, all of which were issued at various times by Defendant (collectively, the "Group Life Policies") and all of which contain the exact same policy language regarding COI and future mortality experience.  A summary of the Group Life Policies is contained in the following table:

| Employer Group | Group Policy Number | Individual Original Cert. No. | Marsh Cert. No.[1] | Death Benefit |
| --- | --- | --- | --- | --- |
| Magellan Health Services | M104310 | 02-1540557 | 6185034 | $120,000 |
| Continental/United Airlines | M103800 | 02-1182984 | 6176621 | $91,000 |
| Continental/United Airlines | M103800 | 02-1071375 | 617784 | $116,000 |
| PWC LLP | M102880 | 02-1345845 | 6168000 | $230,000 |

[1] Since 2007, Marsh has administered the Defendant's GUL policies.  In connection with the transfer of administration, Marsh issued new certificate numbers for the GUL policies, including the Group Life Policies.

- 4 -

| Employer Group | Group Policy Number | Individual Original Cert. No. | Marsh Cert. No.[1] | Death Benefit |
|---|---|---|---|---|
| Hyatt | M101500 | 02-0292413 | 6134689 | $30,000 |
| Continental/United Airlines | M103800 | 02-1069514 | 6176567 | $52,000 |
| Continental/United Airlines | M103800 | 02-1069516 | 6176797 | $102,000 |
| HealthSouth | M103980 | 02-1238468 | 6177968 | $40,000 |
| PWC LLP | M102880 | 02-1162649 | 6167906 | $64,000 |
| Hyatt | M101500 | 02-0291331 | 6134709 | $40,000 |
| Beverly Enterprises, Inc. | M103300 | 02-1317070 | 6172384 | $105,000 |
| Hyatt | M101500 | 02-0289041 | 6134554 | $60,000 |
| Magellan Health Services | M104310 | 02-1413082 | 6185028 | $40,000 |
| Sun Trust Banks, Inc. | M101960 | 02-1499829 | 6137719 | $70,000 |
| Continental/United Airlines | M103800 | 02-1464590 | 6176404 | $50,000 |
| Continental/United Airlines | M103800 | 02-1073543 | 6176160 | $87,000 |
| Continental/United Airlines | M103800 | 02-1077402 | 6176389 | $102,000 |
| Citibank | M100860 | 02-1227450 | 6125869 | $40,000 |
| Pitney Bowes | M103520 | 02-0953505 | 6174342 | $151,000 |
| Stewart Title | M103670 | 02-1325752 | 6175432 | $70,000 |
| Sun Trust Banks, Inc. | M101960 | 02-0871803 | 6138555 | $10,000 |
| Banco Popular | M102890 | 02-0988245 | 6648992 | $20,000 |

11.     Defendant issued the Group Life Policies on various standard policy forms drafted and used by Defendant from time to time; the material terms of the Group Life Policies were substantially similar in all material respects both with each other and all other GUL policies that Defendant issued to the Class.  None of the Group Life Policies has received any COI rate decrease since issuance.

12.     Defendant Connecticut General Life Insurance Company is a corporation organized and existing under the laws of Connecticut, having its principal place of business in Bloomfield, Connecticut.

**JURISDICTION AND VENUE**

13.     This Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action with diversity of citizenship between at least one class

member and one defendant and the aggregate amount of damages exceeds $5,000,000, exclusive

of interests and costs.  Upon information and belief, less than two-thirds of the members of the

proposed classes in the aggregate are citizens of the State of Florida.  This action therefore falls

within the original jurisdiction of the federal courts pursuant to the Class Action Fairness Act, 28

U.S.C § 1332(d).

14.     This Court has personal jurisdiction over Defendant because Defendant has

confirmed that the owner of the Group Life Policies is a Florida entity, Defendant is registered to

do business in Florida, and Defendant has sold policies to and collected premiums on the Group

Life Policies and other GUL policies from Florida citizens.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C.  §§ 1391(b)-(c)

because the events giving rise to plaintiff's causes of action occurred in this District, including

Defendant's COI rate overcharge.

## FACTUAL BACKGROUND

### A.     Connecticut General's Life Insurance Business

16.     Prior to 1998, Defendant offered several life insurance products to consumers

which fell into three broad categories.  The first category was individual life insurance.

Individual life insurance could be purchased by any person meeting the underwriting criteria.

The individual did not have to employed by any particular entity to purchase an individual

policy.  Individual life policies could be a Universal Life (a permanent life insurance policy with

flexible premiums and an investment savings element), "Term" life policy (a policy with fixed

premiums for a fixed period of time), or a "Whole" life policy (a permanent life insurance policy

with level premium payments over time but guaranteed to remain in force for the insured's entire

lifetime or an earlier maturity date, so long as the premiums are paid).

17.     The second category of life insurance was corporate or executive life insurance. These products were typically life insurance policies issued on the lives of employees (with the insured's consent) with the death benefits payable to the employer or directly to the employee's family.

18.     The third category of life insurance was group life insurance which is a type of life insurance that was made available to or covers an entire group of people.  Group life insurance typically falls into two categories:  first, there is group "Term" life insurance policies. These are life insurance policies that are directly tied to an employee's employment and that the employer typically paid part or all of the premiums.  Second, there is group "Universal Life" life insurance policies ("GUL").  As described in more detail below, GUL policies are voluntarily obtained by an employee, are not tied to the employee's employment and are paid for by the employee, not the employer.  GUL policies have been described by some as a hybrid between Term and Whole life insurance.  Any employee who elects to obtain a GUL policy (known as a certificate) with a minimum face amount can do so.  Any employee that wants greater than minimum coverage has to meet the Defendant's insurability requirement to obtain increased limits.  Defendant has sole discretion to determine whether an applicant met its insurability requirements.

19.     Typically, GUL costs less than individual life insurance policies because of the greater volume of participants in a GUL program (large number of employees all purchase at once, get a volume discount).

20.     In 1998, Defendant sold all of its individual life insurance business to Lincoln National Life Insurance Company ("Lincoln National") but kept its corporate and GUL business. Thereafter, Defendant offered GUL coverage to employers, and has sold GUL coverage from

1998 to the present.  Though this Complaint, Plaintiff does not intend and expressly excludes from the class any individual who has an individual life insurance policy issued by Defendant which was part of the business that Defendant sold to Lincoln National.

**B.     The Defendant's GUL Program**

21.     A group universal life policy is universal life insurance offered to a group that is less expensive than what is available typically to an individual.  A group universal life policy is purchased most commonly by businesses looking to make life insurance coverage available to their employees at lower cost.

22.     Buying a GUL policy is similar to buying food in bulk. The cost to cover each individual is cheaper because the policy covers a large group, just as purchasing a large amount of a particular grocery item is cheaper on a per item basis than buying each item separately. Thus, insurers make up in volume what they lose in premiums on individual policies.

23.     A GUL policy is a type of permanent life insurance (i.e., can be maintained even after an employee leaves his or her job) that features a savings component. Employees may choose to pay only the cost of insurance premium or to make additional payments to the cash value of a policy, which they can use to purchase "paid up insurance" or pay the COI charges or access through loans or withdrawals.  The insurer allocates these additional sums to a cash account, which earns a guaranteed minimum fixed interest rate for cash value growth.

24.     A GUL provides flexible premium payments and reliable cash value growth tied to a guaranteed fixed interest rate.  Over time, a policy can accumulate a significant cash value. The policy owner can withdraw the cash value at any time – at any age – generally without tax penalties.  A policy owner may also choose to leave the cash in the policy and allow the cash value to grow, use it to purchase paid-up insurance, or to pay COI charges.  Policy owners also

get the convenience of making contributions via payroll deductions, or they may contribute lump sums in addition to their premiums.  Defendant bills for premium payments in excess of the COI such that the excess premium amount accumulates in the cash value portion of the policy.  The Defendant's GUL policies provide a death benefit plus a cash accumulation account (collectively, the "Death Benefit").

25.    Defendant has issued multiple GUL policies in the name of different employers, such as Hyatt Corp. and CitiBank.  Each policy has a unique number.  The policy itself is held in trust by a third party, sometimes known as a group universal life insurance trust.  When an employee elects to participate in his or her employer's GUL policy, Defendant issues that individual a certificate with a unique number.  The certificate includes all material terms of coverage and is the document that the employee receives providing the agreed upon terms and conditions of coverage.  As provided in the certificate, Defendant cannot change the certificate without the agreement of the owner.  An example of a GUL certificate is attached hereto as Exhibit A.

26.    Each employee that elects to participate in the GUL policy selects the amount of coverage available to the class of employee.  If the owner of the policy desires to obtain additional coverage, the Defendant alone decides whether the respective insured meets Defendant's insurability requirements.

27.    Plaintiff is informed and believes, and based thereon alleges, that with respect to the GUL policies provided by Defendant:

(a)    the employer makes no monetary contribution to the policy premiums; instead, each owner/employee is responsible for paying his or her own COI.

(b)    employee participation in the GUL policy is completely voluntary;

(c)    with respect to the GUL policy, the employer's sole functions are to permit the insurer to publicize the policy to employees, facilitate the collection of premiums—typically through automated payroll deductions, and remit them to the Defendant; and

(d)    the employer receives no consideration in connection with the GUL policy.

28.    Plaintiff is informed and believes, and based thereon alleges, that with respect to the GUL policies, other than identifying which employees are eligible to apply for GUL coverage and setting the face amounts per class of insureds, no employer negotiated the material terms and conditions of coverage of the GUL policies.  Specifically, no employer negotiated any terms related to COI or the calculation thereof.  Defendant provided the material terms and conditions of coverage on a "take it or leave it" basis to employers.

29.    The employer does not determine which employees meet Defendant's insurability requirements, nor does the employer administer claims made under the GUL policy.  Other than identifying the voluntary GUL policy to their employees, the employers play no role in the sale, administration or claims handling of the GUL policies.

**C.    The Cost of Insurance Calculation**

30.    Each of Defendant's Group Universal Life Policy contains the following language about how the rate used to calculate the COI charge — known as the "Monthly Cost of Insurance Rates" — will be based and later reviewed:

> The Monthly Cost of Insurance Rates are determined by [Defendant] based on its expectations as to future mortality experience.  Adjustment in the Monthly Cost of Insurance Rates may be made by [Defendant] from time to time, but not more than once a year, and will apply to Insured of the same class.

Each Group Universal Policy contains this language, and every GUL issued by Defendant contains this language, or language that is substantially similar thereto. These policies are referred to as "Class Policies."

31.     The relevant terms of all Class Policies are substantively identical to those set forth in the certificate attached as Exhibit A. The policies at issue are all form policies, and insureds are not permitted to negotiate different terms. The Class Policies are all contracts of adhesion.

32.     The Monthly Cost of Insurance Rates provision obligates Defendant to review its COI rates annually, and provides that the only factor that the carrier can and must consider when reviewing COI rates are "expectations of future mortality experience." Nothing else. Because the COI rates on the Class Policies must be based solely on expectations of future mortality experience, COI rates must be adjusted whether those mortality experiences are improving or declining.

33.     The size of the COI charge matters to universal life policy owners for at least two important reasons: (a) the COI charge is typically the highest expense that a policy owner pays; and (b) the COI charge is deducted from the account value (i.e., the savings component) of the policy, so the policy owner forfeits the COI charge entirely to Defendant.

34.     Defendant has taken, or forced policy owners to pay, excess COI charges by failing to adjust COI rates in the face of improving mortality, and the COI charges are in excess of what Defendant is contractually permitted to charge.

   **D.     Improving Mortality and Defendant's Unlawful Failure to Base COI Rates Solely on Expectations of Future Mortality**

35.     Defendant has not decreased its COI rates for Class Policies, despite the fact that mortality rates have improved steadily *each year* — i.e., mortality risks have only gotten *better*

for Defendant over time, as people are living much longer than anticipated when the products were priced and issued.

36.     A mortality table is a chart showing the rate of death at a certain age.  Rate of death can be measured as a percentage or in terms of the number of deaths per thousand. Separate tables are produced to reflect populations with different mortality.  Mortality tables will usually have separate tables for gender.  Mortality tables for use with individual life insurance policies additionally distinguish mortality rates for tobacco-use status, underwriting status and duration since underwriting.  Mortality tables are used by actuaries to calculate insurance rates, and are designed to reflect mortality rate experience.

37.     Beginning at least as early as 1980, the National Association of Insurance Commissioners (NAIC) has issued a series of Commissioners Standard Ordinary ("CSO") mortality tables.  These are industry standard mortality tables that are commonly used by insurers to calculate reserves and to set maximum permitted cost of insurance rates in universal life policies.

38.     The 1980 table issued by the NAIC was called the 1980 Commissioners Standard Ordinary Smoker or Nonsmoker Mortality Table ("1980 CSO Mortality Table").  That table was the industry-standard table until 2001.  In 2001, at the request of the NAIC, the Society of Actuaries (SOA) and the American Academy of Actuaries (Academy) produced a proposal for a new CSO mortality Table.  The accompanying report from June 2001 explained that (a) the 1980 CSO Mortality Table was still the industry-standard table and (b) mortality rates had improved significantly each year since the 1980 table issued.  The report stated:

> The current valuation standard, the 1980 CSO Table, is almost 20 years old and mortality improvements have been evident each year since it was adopted .  .  .  .

[C]urrent mortality levels . . .  are considerably lower than the mortality levels underlying the 1980 CSO Table.[2]

39.     The report further explained that "[f]or most of the commonly insured ages (from about age 25 to age 75), the proposed 2001 CSO Table mortality rates are in the range of 50% to 80% of the 1980 CSO Table." This means the tables are showing a substantial improvement in mortality in a 20 year time period.  These mortality improvements represent a substantial benefit that Defendant should have passed on to policy owners.  The final proposed tables were adopted as the 2001 Commissioners Standard Ordinary Mortality Table ("2001 CSO Mortality Table"). The 2001 CSO Mortality Table reflected vastly improved mortality experience as compared to the 1980 CSO Mortality Table.

40.     The Society of Actuaries is currently investigating an update of the CSO tables. An investigative report on the update of the CSO tables by the society was published in March 2015 and showed further significant reductions in insurance company reserves compared to CSO 2001 due to mortality improvements since 2001.

41.     The 2001 CSO Mortality Table was generated from the 1990-95 Basic Mortality Tables published by the Society of Actuaries.  The Society of Actuaries performs surveys of large life insurance companies for the death rates actually observed in their policies and compares these to published mortality tables.  Periodically the Society will publish an updated table to reflect the evolving industry experience.  Major updates they have published over the last few decades include:

- 1975-1980 Basic Select And Ultimate Mortality Table
- 1985-90 Basic Select and Ultimate Mortality Tables
- 1990-95 Basic Select and Ultimate Mortality Tables
- 2001 Valuation Basic Mortality Table

---

[2] *See* Report of the American Academy of Actuaries' Commissioner's Standard Ordinary (CSO) Task Force, Presented to the National Association of Insurance Commissioners' Life and Health Actuarial Task Force (LHATF), June 2001, *available at* http://www.actuary.org/pdf/life/cso2 june01.pdf.

- ▪ 2008 Valuation Basic Table
- ▪ 2015 Valuation Basic Table

42.     The 1990-95 Basic Table reflected the death rates observed by 21 large life insurance companies with policy anniversaries between 1990 and 1995.  This experience study is for data at, around, or immediately prior to the publication of the policy forms which are the subject of this complaint.  The 2001, 2008 and 2015 Valuation Basic tables each show significant mortality improvements from the 1990-1995 Basic tables demonstrating that since the introduction of the 2001 CSO Mortality Table, mortality experience has continued to improve substantially and consistently.

43.     Defendant has repeatedly acknowledged that, consistent with industry experience, its mortality experience has been better than it expected.  For example, Defendant's parent company, CIGNA, made the following statements in its corporate filings:

> 1999 Annual Report:
>
> "Operating Income: The increases in operating income of 7% in 1999 and 8% in 1998 reflect higher earnings from an increased asset base reflecting growth in separate account assets partially offset by lower general account assets. The increases also reflect higher earnings from non-leveraged corporate life insurance business resulting from an increased asset base and, in 1998, favorable mortality experience."
>
> 2005 Annual Report:
>
> "Disability and Life segment earnings increased in 2005, primarily reflecting:
>
> - • Favorable mortality experience in the life and accident insurance businesses;….
>
> Disability and Life segment earnings increased in 2004, primarily reflecting:
>
> - • Favorable mortality experience in the life insurance business; …

- Higher premiums and fees in the disability and life insurance businesses."

2013 Form 10K:

"The lower life loss ratio primarily reflected in lower new claims."

2014 Annual Report:

"The increases in both 2014 and 2013 from operations reflected favorable life results."

2016 Form 10K:

"Results in 2015 increased compared with 2014 due primarily to favorable life claims experience."

"Positive amount reflects a decrease in the discount rate, partially offset by a favorable change in the mortality assumption."

44.     Despite this trend of improving rates of mortality, Defendant has never decreased the COI rates on COI Class Policies.

## CLASS ACTION ALLEGATIONS

45.     This action is brought by plaintiff individually and on behalf of one class pursuant to Rules 23(b)(3) of the Federal Rules of Civil Procedure.

The class consists of:

All owners of "group universal life" insurance policies issued and currently administered by Connecticut General Life Insurance Company that contain the following language:  "The Monthly Cost of Insurance Rates are determined by [Defendant] based on its expectations as to future mortality experience. Adjustment in the Monthly Cost of Insurance Rates may be made by [Defendant] from time to time, but not more than once a year, and will apply to Insured of the same class."  The Class does not include defendant Defendant, its officers and directors, members of their immediate families, and the heirs, successors or assigns of any of the foregoing.  This Class does not include any person who purchased an

individual, non-group policy from Defendant and which was sold to and/or is administered by Lincoln National Life Insurance.

46. The class consists of thousands of consumers of GUL insurance and are thus so numerous that joinder of all members is impracticable. The identities and addresses of class members can be readily ascertained from business records maintained by Defendant.

47. The claims asserted by plaintiff are typical of the claims of the class.

48. The plaintiff will fairly and adequately protect the interests of the class and does not have any interests antagonistic to those of the other members of the class.

49. Plaintiff has retained attorneys who are knowledgeable and experienced in group life insurance matters and COI matters, as well as class and complex litigation.

50. Plaintiff requests that the Court afford class members with notice and the right to opt-out of any class certified in this action.

51. This action is appropriate as a class action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because common questions of law and fact affecting the classes predominate over any individualized issues. Those common questions that predominate include:

(a) the construction and interpretation of the form group life insurance policies at issue in this litigation;

(b) whether Defendant's actions in failing to decrease the cost of insurance charges imposed on the class violated the terms of those form group life insurance policies;

(c) whether Defendant based its COI charges solely on its expected mortality experience;

(d) whether Defendant based its COI charges principally on its expected mortality experience;

- 16 -

(e)     whether Defendant breached its contracts with plaintiff and members of the classes;

(f)     whether Defendant has experienced better mortality than it expected; and

(g)     whether plaintiff and members of the class are entitled to receive damages as a result of the unlawful conduct by defendants alleged herein and the methodology for calculating those damages.

52.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     the complexity of issues involved in this action and the expense of litigating the claims, means that few, if any, class members could afford to seek legal redress individually for the wrongs that defendant committed against them, and absent class members have no substantial interest in individually controlling the prosecution of individual actions;

(b)     when Defendant's liability has been adjudicated, claims of all class members can be determined by the Court;

(c)     this action will cause an orderly and expeditious administration of the class claims and foster economies of time, effort and expense, and ensure uniformity of decisions;

(d)     without a class action, many class members would continue to suffer injury, and Defendant's violations of law will continue without redress while defendant continues to reap and retain the substantial proceeds of their wrongful conduct; and

(e)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## FIRST CLAIM FOR RELIEF

### Breach of Contract

53.     Plaintiff realleges and incorporates herein the allegations of the paragraphs 1 through 52 above of this Complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff and the Class.

54.     The subject policies are binding and enforceable contracts.

55.     Defendant breached the contract by deducting COI charges calculated from COI rates not based on expectations of future mortality experience.  These overcharges include, but are not limited to, the excess COI charges that Defendant deducted by not reducing COI rates based on improved mortality.

56.     Defendant failure to decrease COI rates also violated the contracts' requirement that Defendant review COI rates at least once every year because any such review would have shown the need to decrease COI rates based on the improved mortality.

57.     Plaintiff and class have performed all of their obligations under the policies, except to the extent that their obligations have been excused by Defendant's conduct as set forth herein.

58.     As a direct and proximate cause of Defendant's material breaches of the policies, plaintiff and the class have been — and will continue to be — damaged as alleged herein in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF

### Conversion

59.     Plaintiff realleges and incorporates herein the allegations of the paragraphs 1 through 52 above of this Complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff and the Class.

60.     Plaintiff and the Class had a property interest in the funds Defendant deducted from their cash values in excess of the amounts permitted by the terms of the Group Life Policies and Class Policies.

61.     By deducting COI charges in unauthorized or inflated amounts from the cash values of Plaintiff and the Class, Defendant assumed and exercised ownership over, and misappropriated or misapplied, specific funds held in trust for the benefit of Plaintiff and the Class, without authorization or consent and to the exclusion of the rights of Plaintiff and the Class.

62.     Defendant's conduct constitutes common law conversion.

63.     As a direct an proximate result of Defendant's conduct, Plaintiff and the Class have been damaged, and these damages are continuing in nature.

64.     The amounts of unauthorized COI charges Defendant took from Plaintiff and the Class are capable of determination, to an identified sum, by comparing Plaintiff's actual COI charge each month to a COI charge computed using a monthly COI rate determined using Defendant's expectations as to future mortality experience.

65.     On behalf of Plaintiff and the Class, Plaintiff seeks all damages and consequential damages proximately caused by Defendant's conduct.

66.     Defendant intended to cause damage to Plaintiff and the Class by deducting more from their cash values than authorized by the Group Liability Policies and the class GUL policies.  Defendant's conduct was malicious and Defendant is guilty of oppression in that its systematic acts of conversion subject Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights.  Plaintiff and the Class are therefore entitled to punitive or exemplary damages.  Improperly took money from cash accounts to pay inflated COI.

### THIRD CLAIM FOR RELIEF

### Breach of Fiduciary Duty

67.     Plaintiff realleges and incorporates herein the allegations of the paragraphs 1 through 52 above of this Complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff and the Class.

68.     Defendant holds in trust the Cash Value accounts belonging to Plaintiff and the Class.  Defendant represented to Plaintiff and the Class that it would only take amounts that the policy terms authorized it to take from the Cash Value accounts, specifically the amount that is due to pay the COI for each policy, and nothing more.  Defendant created a special relationship of trust and confidence with the owners, policy owners and beneficiaries of the GUL policies, establishing a fiduciary duty to act in good faith and deal fairly in their best interest with respect to the monies held in trust in the Cash Value accounts.

69.     Defendant breached this duty by acting in its self-interest by over-charging the COI, thereby reducing the Cash Value accounts of Plaintiff and the Class, depriving them the principal and interest that should otherwise be in their cash accounts.

70.     Defendant's breach of this duty was a substantial factor in causing injury to Plaintiff and the Class.

71.     Plaintiff and the Class is entitled to compensatory damages according to proof measured by the amount Defendant improperly took from Plaintiff's and the Class members' Cash Accounts, and the interest amount that would have been earned on the amounts improperly taken had those amounts remained in the cash accounts.

72.     Defendant intended to cause damage to Plaintiff and the Class by deducting more from their cash values than authorized by the Group Liability Policies and the class GUL policies.  Defendant's conduct was malicious and Defendant is guilty of oppression in that its systematic acts of conversion subject Plaintiff and the Class to cruel and unjust hardship in conscious disregard of their rights.  Plaintiff and the Class are therefore entitled to punitive or exemplary damages.

## FOURTH CLAIM FOR RELIEF

### Unjust Enrichment

73.     Plaintiff realleges and incorporates herein the allegations of the paragraphs 1 through 52 above of this Complaint as if fully set forth herein.  This claim is brought on behalf of Plaintiff and the Class.

74.     Plaintiff and the Class conferred a benefit on Defendant by making COI payments that were in excess of the amounts they should have been charged had the Defendant properly accounted for better than anticipated mortality rates.

75.     Defendant has knowledge of this benefit and has voluntarily accepted and retained the benefit conferred on it.

76.     It would be inequitable to allow Defendant to retain such funds, and Plaintiff and each Class member is entitled to an amount equal to the amount each enriched Defendant and for which Defendant has been unjustly enriched.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Awarding Plaintiff and the Class compensatory damages;

3.      Awarding Plaintiff and the Class pre-judgment and post-judgment interest, as well as attorney's fees and costs;

4.      Awarding Plaintiff and the Class an award against Defendant for the amounts equal to the amount Plaintiff and each Class member enriched Defendant and for which Defendant has been unjustly enriched;

5.      Awarding Plaintiff and the Class punitive or exemplary damages; and

6.      Awarding Plaintiff and the Class such other relief as this Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff and the Class hereby demand a trial by jury as to all issues so triable.

Dated: May 16, 2019                    /s/ Edward M. Mullins
                                       Edward M. Mullins  (Fla. Bar No. 863920)
                                       R. Hugh Lumpkin (Fla. Bar No. 30816)
                                       Matthew B. Weaver (Fla. Bar No. 42858)
                                       Christina D. Olivos (Fla. Bar No. 119580)
                                       Reed Smith LLP
                                       1001 Brickell Bay Drive
                                       Suite 900
                                       Miami FL 33131
                                       Tel.: 786-747-0200
                                       Fax:  786-747-0299
                                       *hlumpkin@reedsmith.com*
                                       *mweaver@reedsmith.com*
                                       *colivos@reedsmith.com*

Richard Giller  (*Pro Hac Vice* Pending)
Douglas C. Rawles (*Pro Hac Vice* Pending)
Ashley Jordan (Fla. Bar No. 71924)
Reed Smith LLP
355 South Grand Avenue, 28th Floor
Los Angeles CA 90071
Tel.: 213-457-8000
Fax:  213-457-8080
*rgiller@reedsmith.com*
*drawles@reedsmith.com*
*ajordan@reedsmith.com*
*kellena@reedsmith.com*

James McCarroll (*Pro Hac Vice* Pending)
Casey Laffey (*Pro Hac Vice* Pending)
Reed Smith LLP
599 Lexington Avenue, 22nd Floor
New York, NY 10022
Tel.: 212-
Fax: 212-
*jmccarroll@reedsmith.com*
*claffey@reedsmith.com*

***Attorneys for Plaintiff and the proposed Class***